# National Bank of Phœnixville *v.* Phila. & Reading R. R., Appellant.

[Marked to be reported.]

*Common carriers—Bill of lading—Bill of exchange—Consignors—Negligence—Banks.*

A bank received a bill of lading made out to the order of the consignors, with a draft attached drawn on the purchasers of the car load of goods cov-

ered by the bill of lading. In the bill of lading was a direction to notify the purchasers. The purchasers drew a new draft upon a person to whom they proposed to sell the goods. The bank discounted the new draft, and passed the amount of it to the purchasers' credit. The purchasers then drew a check upon this deposit for the amount of the original draft, and delivered the check to the bank. The purchasers failing to sell the goods to the person upon whom the second draft was drawn, sold them to other parties to whom they directed the railroad company to deliver the car. The bank never notified the railroad company of its possession of the bill of lading, and the railroad company had no knowledge of its existence. The purchasers subsequently failed, and did not pay the second draft. *Held*, that the railroad company was not liable to the bank for the goods.

The action of the bank in retaining the bill of lading without notice to the railroad company, and permitting the purchasers to assume the position of consignors, and to direct and control the movements of the car, was of such a negligent character as to relieve the railroad company of all liability to the bank upon the bill of lading.

Argued Feb. 8, 1894. Appeal, No. 24, Jan. T., 1894, by defendant, from judgment of C. P. Chester Co., Aug. T., 1892, No. 88, on verdict for plaintiff. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Reversed.

Trespass for wrongful delivery by defendant of car load of feed alleged to belong to plaintiff. The plea was not guilty.

At the trial, before HEMPHILL, J., it appeared that, on July 6, 1888, The Kratochwill Milling Co. shipped a car load of bulk feed by a transportation company known as the Erie Dispatch, from Dayton, Ohio, to Lansdale, Montgomery County, Pa., consigned to the order of the Milling Co., " Notify Holloway & Co.," and received a bill of lading from the transportation company therefor. It indorsed the bill, attached a draft for $228 upon Holloway & Co., to whom the feed had been sold, and sent the draft and bill of lading through the Third National Bank of Dayton, Ohio, to the National Bank of Phœnixville, the plaintiff, for collection of the draft and delivery of the bill.

On July 9, 1888, Holloway went to plaintiff bank, took up the Milling Co.'s draft upon him by obtaining a discount from the bank of a draft of Holloway & Co., which he then drew for $331.60 on J. G. Hillegas, of Pennsburg, Montgomery county, payable to order of Holloway & Co., on arrival of car, and turned over the bill of lading with the indorsement of Holloway & Co. thereon to the bank, as security for the payment of this draft.

Holloway did not effect a sale of the car of feed to Hillegas, and the car was not sent to Pennsburg. The draft on Hillegas and the bill of lading was sent to a bank at East Greenfield, adjoining Pennsburg, where it lay until August 31, 1888, when it was returned to plaintiff bank " unaccepted." In the meantime, and before the arrival of the car, Holloway sold the feed for $246.80, to Heiser & Lutz, at Stevens' station, in Lancaster county, on the Quarryville branch of defendant's road, to which place he diverted the car.

On July 26, 1888, Holloway & Co. drew on Heiser & Lutz for the price of the feed, and attached to the draft an order upon the Philadelphia & Reading Railroad Co., defendant, (which company had received the car upon its lines at Tamaqua, Pa.,) to deliver the feed to Heiser & Lutz. Holloway sent this draft, which was made payable on arrival of car, and the order to the Lincoln National Bank, near Stevens' station, for collection of the draft and delivery of the order.

On July 31, 1888, Heiser & Lutz paid the draft on them, and on the following day received the feed from the railroad company upon presentation of the order and the paid draft. The proceeds of this draft were paid to Holloway & Co.

On Dec. 20, 1888, the bank, owing to the increasing number of returned drafts which Holloway failed to take up, stopped discounting for him, and thereupon Holloway failed.

The court charged in part as follows :

" The car which had been started from Dayton and consigned to Lansdale, Pa., had been diverted by the order, it seems, of Mr. Holloway, to a station named Stevens' station, in the county of Lancaster, and reached there about the 24th of July and was delivered to a firm known as Heiser & Lutz on the 1st day of August, 1888 ; Mr. Holloway having in the meantime drawn a draft, with a printed or written order accompanying it, to deliver this car to Heiser & Lutz upon the payment of this draft. They having paid the draft by remittance by check to the Lincoln bank, at Lincoln, Lancaster county, received the draft and order and took the car into their possession on the 1st day of August, as I recall it. [This, without any further showing, was an improper delivery, the title at the time of the delivery being in the bank, it holding the bill of lading which was the evidence of the ownership of the feed at

that time.] [3]   If the case rested here your duty would be plain and simple,—to render a verdict for the plaintiff here for the amount for which the car was sold, which is agreed upon as the value of the feed at the time it was sold, $246.80."

Defendant's points were among others as follows:

"4. The express provision in the bill of lading in evidence, to wit: 'That unless this bill of lading properly indorsed be delivered to the agent of the Erie Despatch at destination on or before the arrival there of the hereinabove described property, the said line is authorized to deliver the said property to the consignee or to the party to whose care it is by this bill of lading consigned, and after such delivery the said line shall be no longer responsible for or on account of this bill of lading, or for or on account of any assignment or transfer thereof,' precludes any recovery in this case under the facts and circumstances here shown and admitted."   Refused. [5]

"5. Under the facts and circumstances shown and admitted in this case, the plaintiff, in permitting Holloway & Co. to sell, divert and deliver cars of merchandise, of which car No. 22,715 in question was one, when it held the bills of lading therefor, made Holloway & Co. its agents, is bound by their action, and cannot recover here.   *Answer:* That I must qualify in this wise, that if you find from all the evidence that Mr. Holloway was acting as agent of the bank, with its authority or its assent, then, with that qualification, this point is affirmed.   But I leave the question of agency for your determination under all the facts." [6]

"6. The failure of the plaintiff to notify the railroad company that it was the holder of the bill of lading mentioned in the statement, and its delay in making any demand for the goods until January 15, 1889, and its knowledge that Holloway & Co. were selling and delivering the goods to persons other than those against whom it held their drafts, with the bills of lading as collateral, are all circumstances to be taken into consideration by the jury in determining the question of the plaintiff's right to recover in this action.   *Answer:* I have charged you already at length upon what, in substance, is covered by this point, but as stated I must disaffirm the point." [7]

"7. If the jury believe from the evidence that prior to the date of this transaction, which is the subject of this suit, Hol-

loway & Co. had failed to meet at maturity drafts which they had drawn on third parties through the plaintiff, and as security for which they had deposited similar bills of lading; these circumstances, together with the other circumstances mentioned in the preceding points, may be taken into consideration by the jury in determining the question of the liability of the defendant, and if the jury believe that if there was a misdelivery, it was caused by want of care or by the laches of the plaintiff, their verdict should be for the defendant. *Answer:* If the laches of the plaintiff induced or led to the delivery, with that qualification, I affirm the point. But that is a question for your determination whether there was laches, and whether the laches occasioned the misdelivery." [8]

"8. If the jury believe from the evidence that the draft of Holloway & Co. discounted by the plaintiff, and for which it is claimed that the bill of lading mentioned in the statement was given by way of collateral security, was drawn on a person who was not in fact the purchaser of the goods, and if the jury believe that similar drafts were drawn on other persons who were not the purchasers of the merchandise from Holloway & Co., and who had not agreed to accept such merchandise and to pay such drafts, then these circumstances, taken in connection with the circumstances, if found by the jury, mentioned in the two preceding points, may justify the jury in believing that there was such conduct on the part of the plaintiff as to deprive it of the position of a bona fide holder of the said bill of lading, and if the jury reach the conclusion, from the circumstances aforesaid, that the plaintiff was not the bona fide owner of the said bill of lading, or that its conduct in relation thereto lacked good faith, their verdict should be for the defendant." Refused. [9]

"9. If the jury believe that the facts and circumstances here shown were sufficient to bring to the bank notice of the fraud perpetrated by Holloway & Co., then its disregard of such fraud, coupled with its laches, constituted such evidence of bad faith on the part of the plaintiff as to justify a finding for the defendant." Refused. [10]

"10. Under all the evidence in this case the verdict of the jury should be for the defendant. *Answer:* That point I must likewise disaffirm, leaving the question to you to determine." [11]

Verdict and judgment for plaintiff.. Defendant appealed.

*Errors assigned* were among others (3, 5–11) instructions as above, quoting them.

*R. T. Cornwell, Gibbons Gray Cornwell* with him, for appellant.—Holloway, upon plaintiff's own showing, was the agent of the bank for the delivery of the merchandise, and the court should have so instructed the jury.

Surely the presentation of the course of dealing by plaintiff's own officer without a word in the cause to challenge its acceptance as absolute verity, is conclusive of agency on part of Holloway : 2 Greenl. Ev. §§ 65, 66, 67 ; 2 Kent's Com., §§ 614, 615 ; Valentine v. Packer, 5 Pa. 335 ; Bredin v. Dulbarry, 14 S. & R. 27 ; Brigham v. Peters, 1 Gray, 147 ; Hall v. Venness, 49 Pa. 464 ; R. R. v. Cowell, 28 Pa. 338.

There was evidence for the jury of such bad faith on part of plaintiff as to deprive it of its position as a bona fide holder for value.

The bill of lading is not the bill of the defendant ; it was issued in Ohio by a common carrier designated as " The Erie Despatch ; " no knowledge of its existence, ownership, or of the terms of the consignment were traced to defendant ; and the bill was not admissible in evidence against the company.

The bill of lading was made and issued in the state of Ohio, and the law of that state must control the construction of said bill, and the rights and obligations of the parties thereto, and others claiming through them : Henry v. Warehouse Co., 81 Pa. 76 ; Brooke v. R. R., 108 Pa. 530 ; Steam Co. v. Ins. Co., 129 U. S. 397.

A bill of lading expressing the terms and conditions of transportation, in the absence of proof of fraud or mistake, is to be taken as the sole evidence of the final agreement of the parties, and by it their duties and liabilities must be regulated : 2 A. & E. Ency. L. 228.

*H. H. Gilkyson,* for appellee.—Defendant's duty was plain, viz : to make diligent inquiry for the holder of the bill, and if not found to store the goods for the account of the owner, subject to defendant's lien for its freight : The Thames, 14 Wall

98; R. R. v. Bank, 123 U. S. 727; Furman v. R. R., 106 N. Y. 579; Forbes v. R. R., 133 Mass. 154; Barber v. Meyerstein, L. R. 4 H. L. 317.

There could be no delivery except in accordance with the bill of lading: R. R. v. Stern & Spiegel, 119 Pa. 30; Hieskell v. Bank, 89 Pa. 155; Act of Sept. 24, 1866, § 1, P. L. 1363 (Purd. 145); R. R. v. Bank, 123 U. S. 727; Shaw v. R. R., 101 U. S. 557; Colgate v. P. Co., 102 N. Y. 120; Furman v. R. R., 106 N. Y. 579; The Thames, 14 Wall. 98; Forbes v. R. R., 134 Mass. 154; Barber v. Meyerstein, L. R. 4 H. L. 317; Chouteause v. Leech, 18 Pa. 232; Coxe v. Heisley, 19 Pa. 247; Bradley v. Whitney, 108 Pa. 368.

Plaintiff cannot be charged with notice of any action of defendant in reference to the deliveries of the cars, unless it was their duty to inquire concerning them: 16 A. & E. Ency. L. 792; 12 Ib. 533; Lodge v. Simonton, 2 P. & W. 439; Bradlee v. Whitney, 108 Pa. 362; Jaques v. Weeks, 7 Watts, 267; Maul v. Rider, 59 Pa. 167.

Neither the title of the carrier company issuing the bill of lading, nor the place where made and issued, nor the provisions contained therein, will relieve defendant here from liability for its negligence in an improper delivery, nor from its common law liability as a common carrier: Steamboat Co. v. Brown, 54 Pa. 77.

At common law a common carrier is an insurer of the property received by him for transportation against all loss and damage happening thereto while under his control unless occasioned by the act of God or the public enemy: Porter on Bills of Lading, § 100; Price v. Hartshorn, 44 Barb. 655; Fish v. Chapman, 2 Ga. 349; Nav. Co. v. Bank, 6 How. 344; Richards v. Hansen, 1 Fed. R. 54.

The contract though executed in the state of Ohio, was made to be performed in the state of Pennsylvania, and is to be governed by the law of the place of performance: 3 A. & E. Ency. L. 561; R. R. v. Rothchild, 4 Cent. R. 109; In re Penna. Ins. Co., 22 Fed. R. 109; Schell v. Stetson, 34 Leg. Int. 114; Prentise v. Savage, 13 Mass. 20; Archer v. Dunn, 2 W. & S. 327.

Common carriers cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law, and it is not just and reasonable

in the eye of. the law for a common carrier to stipulate for ex·
emption from responsibility for the negligence of himself or
his servants: Porter on Bills of Lading, § 103; R. R. v. Pratt,
22 Wall. 134; R. R. v. O'Hara, 3 Penny. 190; Grogan v. Ex-
press Co., 114 Pa. 523; R. R. v. Raiordon, 119 Pa. 577.

OPINION BY MR. JUSTICE GREEN, Oct. 1, 1894:

When the plaintiff received the bill of lading for the car in
question, and the draft for $228 on Holloway & Co., it was en-
titled to demand the money from Holloway & Co., or, they
failing in its payment, it could demand the car of feed from
the railroad company defendant, on payment of freight and
charges.    While it is true that Holloway & Co. were not the
nominal consignees, they were the real consignees, as was evi-
denced by the draft drawn on them and the notice clause in
the bill of lading, viz, " Notify Holloway & Co." In point of
fact Holloway & Co. were notified and they paid the draft.
This would ordinarily entitle them to the bill of lading, and
with it and the paid draft, they could demand and would be
entitled to receive, the car of feed from the defendant railroad
company.    But in order to make payment of the draft Hollo-
way & Co. borrowed the money from the plaintiff in this way.
They drew a draft of their own on Dr. J. G. Hillegas of Penns-
burg, Pa., for $331.60, attached it to the original bill of lad-
ing from the Kratochwill Milling Co., who were the shippers
of the car in the first instance, and the plaintiff bank discounted
this new draft and passed the proceeds to the credit of Hollo-
way & Co.'s account with them. Then Holloway & Co. drew
a check for $228 against their account and delivered it to the
plaintiff who charged their account therewith.    It is necessary
to consider this transaction with much care in order to deter-
mine its true character and effect.    As a matter of course the
bank not only knew precisely what was done, but they directly
participated in the arrangement and became a most active party
to it.    Under the original bill of lading they were the owners
of the car load of feed.    Being in that position they permitted
Holloway & Co. to draw their draft on Hillegas for a still
larger amount than the original purchase money of the feed,
and thereby to assume the position of consignor of the car and
its contents to Hillegas as consignee.    This was the exercise

of an act of ownership over the feed by Holloway & Co., whose position towards the plaintiff now became that of a debtor upon a draft drawn by them upon a third person. It is true the original bill of lading went with the draft, but the consignee would become entitled to it by recognizing Holloway & Co. as his consignors and paying their draft on him. That transaction was between Holloway & Co. and Hillegas, and the relation of the plaintiff was that of a bill discounter with the collateral security of a bill of lading. Granting their right to use and hold the bill of lading for their own protection, it was as a negotiable instrument that they were entitled to hold it, and. the question arises, were they not bound by the ordinary rules to which the holders of that class of obligations are subject? This will be considered hereafter.

Returning to the subject of Holloway & Co.'s intervention in the control and disposition of the car load of feed, we must note the fact that on July 9, 1888, when the draft on Hillegas was drawn, the car was on the way in the course of its tranship-ment. It was subject to the control of the plaintiff as holders of the bill of lading, and they were at liberty to exercise that right either directly by themselves, or through the intervention of any agent whom they might select for that purpose. The car, being on the road, would naturally proceed to its destination at Lansdale, Pa. But in order to have it delivered to Hillegas, it was necessary to await its arrival at Lansdale and then re-ship it to Hillegas, or to divert it on the road by an order to that effect. In point of fact this car never went to Lansdale or to Pennsburg. The latter was the station nearest to Hillegas. It was diverted by the order of Holloway on July 24th, and consigned by him to Heiser & Lutz at Stevens' station, Lancaster county, where it arrived on July 26th. Holloway & Co. drew a draft on Heiser & Lutz in favor of the National Bank of Lincoln, Pa., for $246.80, and sent it to the bank with a written order for the delivery of the car to Heiser & Lutz. On the arrival of the order and draft the bank notified. Heiser & Lutz, who at once paid the draft, took up the order, and then taking the order of the consignors, Holloway & Co., and the paid draft, delivered them to the railroad company and received the car of feed. Thus the consignor of the car ordered its delivery to the consignee and sent the order to

the bank with a draft for the payment of the feed which when
paid entitled the consignee to the car.   In all this transaction
the name of this plaintiff did not appear in any manner.   They
had given no notice to the defendant that they held a bill of
lading for the car.   They had sent the bill of lading to another
bank in another county with a draft on another person and had
made no attempt to control the movement of the car.   The de-
fendant had no notice of the existence of such a bill of lading,
and when they delivered the car to Heiser & Lutz they were act-
ing on the written order of the party who consigned the car.   It
is difficult to understand how the defendant was guilty of any
negligence in making such a delivery, and when we investigate
the evidence it is very easy to understand how the transaction
occurred in the way it did with the knowledge, consent and
concurring action of the plaintiff.   The testimony that proves
it is entirely undisputed and comes from the plaintiff's wit-
nesses.   As has been already stated, when the plaintiff notified
Holloway & Co. of their holding the bill of lading and the
draft, from the Kratochwill Milling Co., Holloway & Co. paid
the draft and drew another draft on Hillegas, which the bank
discounted.   The bank took no further notice of the car, or
what was done with it, but permitted Holloway to draw a
draft on Hillegas and thus to assume the position of consignor.
While holding this position he ordered the car to another con-
signee at another place, and he was able to do this as a direct
result of the bank's action in participating with him in a new
consignment.   They made no attempt to exercise the slightest
control over the car or its movements, nor did they give any
notice to the defendant that they held any bill of lading.

The witness, Horace Lloyd, cashier of the plaintiff bank, be-
ing examined in behalf of the plaintiff, thus testified : " Q. Was
this first draft of $228 paid by check ?   A. Mr. Holloway paid
it by check.   Q. After discounting the draft of $331.60 which
is now attached to the bill of lading, what did you do with both
of them ?   A. The draft for $331.60 was sent to the Perkiomen
National Bank of East Greenville, the nearest point to the des-
tination.   Q. Was it paid?   A. No, sir, it was not.   Q. When
was it returned to you?   A. August 31st.   Q. What year?
A. 1888."

After testifying to the course of dealing between the bank

and Holloway in regard to bills of lading and drafts paid and
unpaid, which came with them, he was asked: " Q. You just
held them waiting for him to come in and take them up?
A. Yes, sir.   Q. When he did come in and take them up what
became of the bill of lading?   A. He would take that along
with him.   Q. How soon after these drafts came back would
he come in and take them up?   A. That varied somewhat.
Q. Ordinarily?   A. Some of them laid there a month or prob-
ably more.   Q. Some a month and some longer?   A. Yes, sir.
Q. And some he would take up in a week or so?   A. Yes, sir.
Q. And your practice at the bank was to hold these bills of
lading and drafts for him to take up?   A. Yes, sir.   Q. In point
of fact you continued to hold them right on down from 1887
as they occurred down to January, 1889?   A. I think some of
these earlier ones probably he would attach to other drafts and
take them up in that way.   Q. That is, when a draft came back
unpaid the bill of lading would come back with it.   A. Yes,
sir.   Q. He would then draw on somebody else?   A. He would
take up that draft, draw on somebody else, attach the bill of lad-
ing to a new draft.   Q. You discounted that, and he would take
up the old draft?   A. Yes, sir.   Q. That is the way it was done?
A. Yes, sir.   Q. How often would he do that when they would
come back?   A. Not so often *but he would represent that the
stuff had been sold to some other person or was ordered somewhere
else. . . . .* Q. He would come there every morning, would he
not, generally?   A. Yes, sir.   Q. He would see first what drafts
from the west you had on him for car loads of stuff there were
on the way?   A. Yes, sir.   Q. What would he do then?   A. He
would return to his office and prepare drafts on the consignees.
Q. On customers of his?   A. Yes, sir.   Q. What then was
done?   A. He would bring them in, have them discounted, at-
tach the bills of lading and send them off.   Q. You would dis-
count them and the money he got to his credit from these
discounts he would check over to you in payment of these very
drafts on him from the west?   A. Yes, sir. . . . . Q. All these
drafts running back through these pages that are marked " re-
turned " were dishonored drafts?   A. Yes, sir.   Q. Running
back to November, 1887, you say?   That was his course of busi-
ness?   A. Yes, sir.   Q. *You did not notify the railroad com-
pany in any case that you held the bill of lading? A. Not that*

*I know of.* Q. But you held through all this period for him to come in and take them up? A. Not all of them. One of them it seems was held that length of time ; the others were much better. Q. Until January, 1889, you gave the railroad company no notice? A. None that I know of."

The witness then proceeds to state that the bank still held unpaid the draft from November, 1887 ; another one from Dec. 14, 1887; another one from Dec. 16, 1887, which was an original draft never paid; another one from January 5, 1888; another from Jan. 7, 1888; two others from Jan. 31, 1888; another from Feb. 1, 1888 ; another from Feb. 15, 1888 ; another from June 6, 1888; another from June 8, 1888; another from June 16th; another from same date; another from June 25th; another from June 27th ; another from July 3d; all of them unpaid and still on hand. All of the foregoing were held from times prior to the one of July 9, 1888, involved in this suit. Others followed afterwards in the same course of dealing and with the same results. All were unpaid until in January, 1889, when this most extraordinary method of doing business came suddenly to an end by the failure of Holloway, and at that time the amount of these unpaid bills of lading and drafts which accrued against this one transportation company only was $4,863.66, and there were, besides, other large claims of the same character against other railroad companies upon similar transactions. As a matter of course the car loads of goods against which these bills of lading and drafts were drawn did not remain on the railroads, but were allowed by the plaintiff to go wherever Holloway chose to send them, and the bank, trusting to him for payment, parted with the control which they might have exercised through their bills of lading, gave no notice to the defendant that they held or ever had any such bills until January, 1889, and then came forward with an enormous bill of nearly $5,000 which was the result exclusively of their own gross negligence. Such conduct on the part of the plaintiff was not merely evidence of laches, it was laches itself of the grossest character ; it was conclusively proved by the plaintiff's own witnesses called and examined on their behalf, and was therefore an entirely undisputed fact in the case, and the jury should have been so instructed.

Further evidence was given by the plaintiff's witness Horace

Lloyd, as to the particular bill of lading in this case, all to the same effect, as follows : " Q. Going to the bill of lading in this case, the car was consigned to Lansdale was it not ?   A. I believe so.   Q. Mr. Holloway drew on a man by the name of Hillegas.   What was his first name ?   A. Dr. J. G. Hillegas. Q. At Pennsburg?   A. Yes, sir.   Q. Pennsburg is on the Perkiomen road ?   A. Yes, sir.   Q. Lansdale is over on the North Penn ?   A. Yes, sir.   Q. The car never went to Pennsburg at all?   A. I suppose not.   Q. It went where ?   A. I do not know.   Q. Do you know to whom this car was delivered ? A. I do not.   Q. You know it had been delivered to somebody?   A. Yes, I believe so.   Q. Holloway drew on Hillegas and got you to discount the draft, and thus got the money to pay the Kratochwill draft, did he ?   A. Yes, sir.   Q. And then he sold the car away to a man at Stevens and got the money twice, did he ?   A. I don't know.   We do not know.   Q. Heiser & Lutz got the car ?   A. I don't know. . . . Q. He got the money from you for this car?   A. Yes, sir.   Q. And he got the money for this car after it was sold ; he put that in his pocket and thus got the money twice ?   A. I suppose so. . . . Q. What explanation would Mr. Holloway make when drafts such as that (a draft on one Lobb) came back with the bills of lading attached ?   A. As I said he would not often make any explanation to me.   Q  Did you ever hear him make any explanation?   A. Yes, sir.   Sometimes he would say he had sold the stuff to other parties, that the car had been diverted. Q. That the railroad company had diverted the car ?   A. By his orders.   Q. And would he oftentimes take the same bill of lading and attach another draft to it and send elsewhere giving the same explanation?   A. Yes, sir, sometimes.   Q. Have you anything upon your books or elsewhere to indicate when these bills of lading were returned ?   A. No, sir.   Q. You simply have the fact that they were returned ?   You don't know how long the banks to which they were sent kept them ? A. No, sir.   Q. And if they were sent a second time, how long they were kept at the second bank ?   A. No, sir."

No testimony could be more convincing, in truth conclusive, of the fact that the plaintiff bank allowed Holloway to assume control over the car loads of goods consigned to him, after they had received the bills of lading and drafts attached.   They

gave themselves no concern about the cars. They gave no notice to the defendant in any instance of the fact that they held any bills of lading. They allowed Holloway to pay the original drafts by discounting fresh drafts on other persons to whom he sold, or said he sold, the goods consigned, and then allowed him to control the movements of the cars without inquiry, or any attempt to follow them. And this even after they knew the second drafts had come back unpaid and remained on their hands for months thereafter. Necessarily they knew that he directed the subsequent consignments and thus permitted him to assume the position of consignor. They thus put it in his power to do as he pleased with the cars, and if they are to be regarded as continuing owners of the goods, they must also be regarded as having authorized him as their agent to direct the subsequent movement of the cars. For it cannot be tolerated that he should be allowed by the bank to assume a control over their goods by means of which he could deceive and mislead other innocent persons to their harm, without being responsible for his acts.

Further proof from the same witness of the plaintiff is quite conclusive in this connection: " Q. You knew he was handling the car? A. Yes, sir. Q. And that this was perishable material, that it was being sold to somebody; that it was not lying there all these years? A. I supposed the railroad company had no right to deliver it; I thought they might store it. Q. You knew he was handling these cars? A. Yes, sir. Q. And when a draft that you would discount came back dishonored, you knew he was handling that car in some way. You were not looking after it, were you? A. No, sir. Q. And you were not notifying the company that you held a bill of lading covering that car? A. As I say, he would put us off by saying he had sold it, diverting it in some way."

In the face of such testimony as this it seems grotesque to assert, or to argue, that the bank was at liberty to hold its original bill of lading for an indefinite time, months or years, without any presentation or even notice to the railroad company, upon the theory that the company was bound to hold the goods and store them awaiting the advent of a bill of lading of the mere existence of which they never had the slightest knowledge. Especially is this so in view of the fact that the great

bulk of railroad transportation of freight is not accompanied by negotiable bills of lading payable on delivery, and also that it was testified by another of the witnesses for the plaintiff, A. L. Heiser, station agent at Stevens, that cars frequently came on a manifest alone without any bill of lading at all, and that they were often required to deliver freight on orders.

The learned court below submitted the question of laches and agency to the jury with instructions that if they found either they should render a verdict for the defendant. Of course this could only be done upon the theory that there was sufficient evidence in the case to justify such a verdict. But in our opinion there was no disputed question of fact upon either of these subjects, and there was therefore nothing to leave to the jury. The evidence was altogether undisputed. It was given by the plaintiff and was entirely uncontradicted. In fact it was simply overwhelming and there was nothing to countervail it.

At the end of the plaintiff's testimony the defendant's counsel asked for a compulsory nonsuit, and we think a nonsuit should have been granted. The tenth point of the defendant requested a binding instruction to the jury to render a verdict for the defendant, under all the evidence. We are clearly of opinion that this point should have been affirmed. Specifically we sustain the third, sixth, seventh, eighth, ninth, tenth and eleventh assignments of error, and incline to sustain the fifth, but it is not necessary to discuss it.

Judgment reversed.